Good morning. You may be seated. This is our second case of the day, 4-13-1067, David Pickett v. Archer-Daniels-Midland. Let's see, Attorney Williamson is here on behalf of the appellant. Yes, ma'am. Okay, and Attorney Wolf is here on behalf of the appellee. Good morning. All right, Mr. Williamson, you may proceed. Thank you, Your Honor. Good morning, members of the court. I know you've reviewed the brief. You understand that this is an appeal from the denial of a new trial arising out of my client David Pickett's action against the EDM. He had three essential claims at the time of trial, race and gender discrimination as a result of a failure to promote to a milling manager position, and there were different references given to that during the course of the trial. That's the reference I'm going to give today to help myself without repeating that milling manager position. He has a third claim for retaliation. The retaliation claim arose because he was complaining about discrimination by his supervisor, Kathy Whitley, internally with ADM, and within a temporal proximity of that complaint, he was not given the milling manager position, which we believe he was best qualified for. Now, I made my bed doing the brief, and I started as a priority the special interrogatories. When I reviewed the briefs again this morning, I'm not sure that as we stand here today, I still concur that that is the major issue in the case, because I think the instructions in this case were devastating, and devastating to the plaintiff, and inaccurate, and not an adequate statement of Illinois law for following the instruction of the Illinois Supreme Court. But getting back to the special interrogatories, there were three of them, 19, 20, and 21. Of course, they were attached to the brief. 19 and 20 contained multiple questions, which I understand the Illinois Supreme Court's ruling is improper, and I cited the Smart case from the First District in the 2013 case, which I understand specifically held that it's improper to give a special interrogatory that's not a single direct question interrogatory. The other problem with the special interrogatories on 19 and 20 is they use the term adverse job action. In fact, 19 asked the jury in the first question to find if the entire circumstance of the trial constituted an adverse job action. This is a legal determination to be made by the court, and in fact, the defendant had argued at the time of summary judgment this wasn't an adverse job action. There's no definitional instruction under Illinois law as to adverse job action, and we'll get to that in a short time, but the point is the defendant submitted to the jury a special interrogatory requesting a finding as to whether the circumstances constituted an adverse job action. That was wrong. It was improper. The court shouldn't have done that. We objected. They then answered the second question on both 19 and 20. The circumstance of the special interrogatory, I hope, is clear to the court. The jury sends out two questions. They are confused. The court answers yes to both questions. The trial goes on, and they eventually enter a verdict against Mr. Pickett, but the questions themselves indicate the jury's confusion because of the special interrogatories. The questions both relate to the special interrogatories, saying, now, if we do this, can we do this with respect to the special interrogatory? Of course, they're in the record. But the exact consequence of the Supreme Court's prescriptions on special interrogatories occurred in this case. Special interrogatories are to test the jury's verdict. A panel of this court, anyway, in the Snyder case of 1996, stated, in part, the purpose of a special interrogatory is to sharpen the jury's understanding of the facts of the case so they ultimately can arrive at a conclusion in the case. These special interrogatories did the exact opposite. Instead of sharpening their understanding, they confused the jury. And at that point in time, all was lost in terms of an ultimate jury verdict in the case. Are you saying that case law holds that if the jury submits questions, it is confused? No, no, certainly not. Obviously, a jury could submit a question, and if the question's intelligent and to the point, the court can answer it, and none of the parties are harmed by that. What I'm saying is, the questions that the juries actually submitted indicates their confusion. Because they required further interpretation by the court, which was only a one-word response, Your Honor. Yes, both times. No further instruction, no further direction to the jury as to the consequences of their questions relating to the special interrogatory. So yes, certainly they could have asked questions that were intelligent, directed, based upon proper special interrogatories, and it would have been helpful to both the court and counsel, but it was not. It was confusing to the jury, and allowed the jury to render a verdict I don't think they otherwise would have rendered. I'm going to move on to the instructions because, unless you have further questions, because I believe the instructions are themselves the ultimate determination of how this case should be ruled upon by this panel. The plaintiff submitted, and I won't go into great detail as to the substantive basis for plaintiff's instructions 10 and 12, issues and burden of proof instruction based on IPI 20.01, and I can't remember the burden of proof instruction. And in those instructions, the plaintiff put in the elements of proof for a failure to promote case and employment discrimination under Illinois case law, and inserted it consistent with the facts of the case. The defendant used, as we pointed out in the brief, entirely instructions from the federal court system. And the problem with this is, in some instances, the Illinois Supreme Court does not follow federal law on employment discrimination, and the substance of some of those instructions were totally contradictory to Illinois case law related to employment litigation, and I'll specify that in a moment. I'm going to go directly to defendant's instruction number five to show you the consequences of that action. A portion of defendant's instruction number five said a lateral or lesser position that would have resulted in lesser pay is not an adverse job action. That's a portion of that instruction. Now, the first issue is, there's absolutely no testimony in the trial that the milling manager position would have resulted in lesser pay to anyone. Certainly the person who's picked, Lori Zywick, gets an eight and a half to nine percent pay increase because of the promotion in accordance with defendant's agents Case McGee and ADM Vice President. He testified to that. And yet the defendant procures and gives this instruction, suggesting that... What does the instruction say again? I'm reading, I think, correctly, your honor, a lateral or lesser position that would have resulted... Would not. Would not. Is not an adverse job action. No, would not have resulted in higher pay. Well, I may have misread it. Well, that's pretty important. It is important. What I'm suggesting is that there is nothing in the trial that would have allowed for this instruction. Well, how about the fact that the company said, we're not going to pay anybody $100,000 to do this job. It never said that. What the company said was that, yes, Lori Zywick gets an eight and a half to nine percent pay increase. And then we said, well, another person was considered for that job. And that's an evidentiary ruling later on. So we attempted to put in the testimony as to any records salaried in 2010. Trial court wouldn't allow that. Defendant objects to that. Trial court wouldn't allow it. He is one of the persons named by Kathy Whitley as being in consideration for the milling manager position. So the jury never knows what Andy Rickard's salary is in 2010, which was considerably higher, by the way, than David Pickett's. So the idea and the suggestion put forth by ADM on the salary issue for the milling manager's job is, yes, Lori Zywick would get a pay increase, but she didn't have as high of a base salary as David Pickett. Therefore, it's not an adverse job action, because if Pickett would have gotten the job, Case McGee testifies, I would have just considered this a lateral transfer. Now, we weren't allowed to put in the testimony about Andy Rickard's, who was also considered. And then when there was a further question to Ms. Whitley as to do you know the salary range for Mr. Rickards or anyone else considered for the job in 2010, no, I don't remember that. So the jury never knew that. So they are left with the impression that so far as my client is concerned, if he would have been picked for the milling manager's position, it was not a job promotion. It was not an adverse job action. And yet, Lori Zywick is picked for the position, given a relocation package, whereby they bought her house, transferred her to another city. There's no evidence about the relocation. That's true. I mean, if that's part of the idea that that's what makes it a promotion or a really favorable job action, should we know about that? The trial judge did not allow Mr. Pickett to testify about the relocation package. He said he knew there was a relocation package. He didn't know what the details of it were. That's right. He wouldn't let him go into any specifics as to what the relocation package was. If I look in the record, it's going to show me that the judge prevented him from testifying about that or that it was not offered. Oh, yes, sir. Mr. Pickett is asked about the relocation package, and initially he says he identifies as a relocation package, but he's not allowed to testify to any further circumstance that I recollect as to the substance of the relocation package itself. He wasn't allowed to say to the jury, for instance, that they were going to buy his house. So there's no definitive testimony about the substance of the relocation package other than the idea there's a relocation package, because Mr. Pickett had gotten a relocation package before when he'd been promoted. So that was the initial question. Did you receive a relocation package before? Yes, sir. What did that consist of? I mean, was that question asked? I don't want to, you know, think my memory is good enough to tell you the exact sequence. I don't think in his prior relocation package he moved out of Decatur. That's my recollection. But I'm sure he's sitting back there giving me whatever shake of head he needs to. I don't think he moved out of Decatur in the prior relocation package, so he didn't have to have his house purchased at that point in time. That was in the early 2000s. The relocation package was something we certainly wanted to get in evidence, and we did not get it in evidence, because it was part and parcel of the reason he wanted the billing manager's position. It was an advantage to get out of Decatur at that point in time and have his health bought under those circumstances. I want to point out that Defendants Instructions 6, 7, 8, and 9 also adopt language that does not exist in Illinois law. There is no case law holding substantiating the language given in those instructions. In fact, I'm just going to glance at them again quickly to point that out to you. In Instruction No. 6, it starts off, Plaintiff must demonstrate that he was better qualified than Lori Zywick. Your Honors, this is an absolutely key component to a failure to promote case. Does the plaintiff have to prove that they are better qualified or as qualified than the other party? This is the instruction that was given by the trial court pursuant to the Defendants Instruction No. 6, citing, of course, federal law, the Seventh Circuit, because there wasn't any Illinois case that said the plaintiff had to show that he was better qualified. And it's a crucial, prejudicial, consequential instruction in this lawsuit that changed the way the case went. Again, on race discrimination, on both 7 and 8, the language in the second paragraph of that instruction says at the end of that sentence, but everything else had been the same. And that is not language that's ever been used by Illinois decisions in Illinois case law relating to employment litigation. Again, he's referring specifically to federal civil jury instruction in the Seventh Circuit 3.01. That is what they use at the federal level. The same thing on 8. On 9, this is a retaliation instruction. The court adopts a U.S. Supreme Court's ruling in University of Texas Southwestern Medical Center, a 2013 case, where they say you put in language but for when you're speaking about retaliation. Now, it may be that the Illinois Supreme Court or this court will adopt the language and adopt that standard of proof for retaliation in Illinois. But to my knowledge, no reported case has done that up until this point in time. And I pointed that out to the trial court. And I have to say on behalf of the trial court that didn't have the experience of doing employment litigation, nor is there a great deal of case law for the trial court to follow in that regard. But the issues and the problems of these instructions were all pointed out to the trial court. And they become crucial to the plaintiff, such as whether we have to prove he's better qualified than somebody else or as qualified. Normally, when one says there's a failure to promote, you say the reason for filing a lawsuit based on discrimination for failure to promote is that the plaintiff is African American or whatever standard they're basing it on. And they were as qualified as the other person. And they were not picked because of their race or they were not picked because of their gender. And in this case, it was a perfect set off. The person who's picked is a white female who didn't have nearly the amount of experience my client had. Over 30 years with a company who didn't last in the job very long at all after she was picked for this position. Is that in the record? I don't think so. Well, it couldn't be. It is in the – I'm not sure, Judge. I'm not sure. I think it's in the post-trial motion is what I want to say. And that is in your record, I believe. It is in the record, Judge. The testimony was given during the course of trial that she left the company after about 11 months. Again, I cannot tell you from memory who was testifying about that and when it occurred. But, yes, I believe that is in the record. So the jury was aware of that. But the point is this lady, this individual, was not as qualified as my client. And if the standard had been used where they should have had equal qualifications and then the jury could have picked because of the instructions, we wouldn't be here today. But we didn't get a fair trial. The playing field was not level and the instructions were improper that were given to the jury. I don't want to overlook the trial errors. And one of the trial errors is probably something that's not apparent from my brief. There was an exhibit offered by the plaintiff, exhibit number seven. And it's a compilation by the plaintiff in 2008 whereby he gives to his supervisor desired goals. Where do I want to be? What is my situation with ADM? And under one of those desired goals in 2008, he writes out and delivers to Kathy Whitley a desired goal of being the milling manager. Which was a position that didn't exist at that time. Now the trial court denied admission of exhibit number seven. What was the effect of that? The effect of that was that I could not ask Kathy Whitley if she then told Mark Kohlhurst, another ADM vice president, that Pickett had done this in 2008. So Ms. Whitley and Mr. Kohlhurst perceived to tell the jury that in fact they construct the idea for this position in 2010. That's when the idea comes up. And when the trial court allowed those two individuals to do that, we lost the ability to test the credibility of Ms. Whitley. After all, if she didn't tell Mr. Kohlhurst in 2008 of this position and this plan by the plaintiff, then maybe the jury would believe she might be prejudiced against my client. And if she did tell Mr. Kohlhurst this situation in 2008, how could these two individuals be planning this position in 2010? That wouldn't make sense. I'll conclude my argument at this time. Unless the court has any questions, I'll try and respond to counsel's argument. Thank you. Thank you. Counsel? Good morning. May it please the court. Counsel. On September 23rd through 25th of 2013, the Honorable Thomas E. Little of the Circuit Court of Macon County presided over one of the few employment discrimination cases in the state of Illinois to go to trial since the Illinois Human Rights Act was amended to permit jury trials effective January 1st of 2008. An issue was whether Archer Daniels Midland Company did not select David Pickett for a position as a human resource manager at its milling division in Overland Park, Kansas. He contended that the decision was based upon his race, his gender, and for having made a prior internal complaint of discrimination. The jury concluded that Mr. Pickett failed on all three of his claims. Judge Little painstakingly went through the evidence and also the instructions to be given to the jury. And we submit was correct with regard to his evidentiary rulings and the instructions that were provided to the jury. He used Illinois pattern instructions where he could, but as we all know, in light of the amendment to the Illinois Human Rights Act, the IPI has not yet caught up. There are no Illinois pattern instructions for employment discrimination cases. As a result, he sensibly did what Illinois courts have done for years, look to the federal jurisprudence in this area. And he used the model instructions from the United States Court of Appeals for the Seventh Circuit in very large part. Instructions that were also tendered by Mr. Williamson. We have to take a look at this situation and determine where the law in the state of Illinois has come from. And it has uniformly, with one exception, come from the federal law. Now one exception being areas of sexual harassment, which has its own statutory provision in Illinois, in section 2-102D, and is not at issue here. The remaining elements, when you're talking about gender, when you're talking about race, when you're talking about retaliation, have all been adopted from the federal law. Following trial, Judge Little considered Mr. Pickett's motion, heard the briefs, considered what he had heard, heard argument, and properly denied the motion for a new trial. And we believe that he was correct in doing so. Good morning, my name is Tim Wolfe and I represent Archer Daniels Midland Company. Your Honors, I think it's important when we look at this situation, to briefly focus on some of the facts that gave rise to the claims here. ADM Milling Company, as its name might suggest, a company that mills and creates products out of wheat. They sell flour, essentially. The corporate headquarters for this division of ADM, which is in Decatur, ADM Milling is in Overland Park, Kansas. They had received the human resource services from ADM's corporate headquarters in Decatur. In 2010, the president of ADM Milling, Mark Colcourt, determined that he wanted to have somebody on site in Overland Park who could assist with human resource functions related to the corporate office and to the commercial side of their business. These are largely the people who are involved in administration, payroll, benefits, buying and selling of their products. Not their operations, not their mills, not the place where the flour is produced. Those functions were largely related to the labor relations group, which is in Decatur, and would continue to work with the plants. Mr. Colcourt is looking for something entirely different. He wants somebody who can deal with compensation, benefits, succession planning, the development of executives within the organization. And he sets the terms of what he's looking for in terms of the qualified candidates. He identifies those skill sets, and then he contacts human resources in Decatur and asks them to source potential candidates for him. Kathy Whitley, at the time, was the vice president of human resources for North America at ADM. She considered her organization of approximately 50 individuals, and she determined that there were three people in that group who would be a good fit based upon the characteristics that Mr. Colcourt said that he was looking for. She vetted those names with two other individuals in her group. Her boss, Senior Vice President Mike D'Ambrose, who's in charge of the entire human resource function for ADM globally, he concurs that this is the right group of three and that there are no other individuals who properly fit that mold. Also talks with Case McGee, who's intimately familiar with all the people in that group. He agrees. There's three individuals, two males, one female. The two men have no interest in the job. So, while qualified, aren't considered candidates for the job. Leaves one person internally to be considered. Lori Zibiotz. Ms. Zibiotz was a field human resource manager at a plant in Columbus, Nebraska. She had had extensive experience in other corporations doing the exact type of work that Mr. Colcourt was looking for. Mr. Colcourt invited her to Overland Park, interviewed her with his entire management team, and determined that she was a good fit. He then had to decide the compensation level for this position. He looked at the field human resource position, and that was a job that was worth approximately $77,000. Again, that's the one person who would be working in a plant level, responsible for one plant. What Mr. Colcourt was creating here was a divisional position, a step above that. He determined, with Case McGee, the global head of compensation and benefits, that this manager position at a divisional level had a value that was approximately 9% more than a field human resource rep. So, for Ms. Zibiotz, this meant a change in salary from approximately $77,000 to $87,000. This does not mean, however, that anybody who was selected for the position would have got a 9% raise. That's not how compensation works. You look at the value of the position. You don't just take anybody and add 9% to their salary. Mr. McGee indicated that this position would not have been worth over $100,000, and Mr. Colcourt, the hiring manager, specifically stated that he would not pay somebody $100,000 for this job, and Mr. Pickett was earning in excess of $100,000 at that time. Mr. Colcourt made the decision. He, frankly, didn't have Mr. Pickett on his radar at all, because Mr. Pickett is a labor relations representative, dealing with the operations side of the business, dealing with the plants, dealing with collective bargaining agreements, grievance processes, none of the things that he was looking for in the corporate office. He didn't consider race, he didn't consider gender, and he certainly didn't retaliate against Mr. Pickett because he didn't even know that Mr. Pickett had made a prior internal complaint, and that complaint certainly wasn't about him. Now, we've heard from counsel that there, from the appellant's perspective, were problems with the jury instructions, and one of the first things we hear about are the special interrogatories. They're called confusing. However, all they were were very simple, very direct questions that were neutral in their nature. They were not compound. He focuses on the Smart case. But in Smart, what the court said there is, the special interrogatory that was tendered to the jury was inappropriate because it was compound. It asked the jury in that case whether there was contributory negligence and was it in excess of 50%. The particular special interrogatory tendered in that case was not appropriate. But when you have a single, clear question, you can have more than one of them. They just can't be in the same special interrogatory. And what do we have here? We have very simple, very neutral questions. For example, in number 19, did Plaintiff prove by a preponderance of the evidence that not being selected for the ADM Milling Company Human Resource Manager position constitutes an adverse employment action? Doesn't tell the jury which way to side and asks but one question and then moves on to another. That's perfectly permissible under the authority in the state of Illinois. To suggest that the jury was confused by these simple questions because of the notes that they sent out to the judge, I think is speculation on counsel's part. They asked for clarification. That's not uncommon in jury trials. And the mere fact that they were only out for two hours would not suggest that we had a room full of individuals who were hopelessly confused by the simple questions that were put to them in the special interrogatories. I did want to address the suggestion in Mr. Pickett's brief that the Goranowski case supports the notion that this is a question of law that shouldn't have been given to the jury. That's incorrect. The Goranowski case is not an employment discrimination case. It does not deal with the Human Rights Act. It dealt with a question in a FELA case on duty. And their duty was deemed to be a legal question but has nothing to do with adverse employment action. They argued at the summary judgment stage that there were questions of fact and it did, in fact, need to be addressed by the jury. So it was appropriately before the jury. Also, with regard to the special interrogatory given on the retaliation claim, there we had to take into account the fact that the United States Supreme Court had just amended its standard with regard to retaliation claims to incorporate a but-for standard. And in light of that brand-new authority, that had to be incorporated in. And Illinois has said, we follow the law from the federal system when it comes to these areas, with the exception of sexual harassment, which was not at play here. The instructions that we provided did, in fact, model the law. And when we look at the law, you have to look at where are we at? What stage of the game are we looking at? Because I think there's some confusion in Mr. Pickett's argument. What is involved here is we're at trial. The McDonnell-Douglas standard that is set forth in much of the case law that is seen does not apply at the trial level. McDonnell-Douglas was a tool that the United States Supreme Court developed in 1973 to help district court judges evaluate employment discrimination cases at the summary judgment stage, knowing that at summary judgment it can be a difficult proposition for a plaintiff to show his case. It sets out a three-part test that, with a burden-shifting burden of proof, that goes away once you get past summary judgment. And we pointed to the authority in our brief where Judge Posner sets out why that's the case. And it's very clear that it does not apply once you get to the trial stage. Now, in the instructions that the plaintiff tendered at the trial court level, we had an even bigger problem. Even if McDonnell-Douglas applied, they only took the first third of the three-part test and plugged that into the instruction. So it wasn't even a complete instruction, and Judge Little properly disregarded those tendered instructions, which were not IPI. They were simply taking the first third of a summary judgment standard and trying to instruct the jury on that. We submit that the instructions that were tendered, based upon 50 years of experience in the civil rights arena in the federal court system, were the proper ones to use. What about the argument that the instruction said he had to prove he was better qualified, as opposed to as qualified? When you look at that particular instruction, you have to remember what you're looking at here. And it's an appropriate instruction, and it's something that's used regularly in the federal court system because when you look at a job, and when you look at somebody who's picked candidates for a job, a business has the right to choose who it thinks is best qualified. And if you've got two individuals who are equally qualified, you defer to their judgment. In order to infer that there was some invidious characteristic used, such as gender, such as race, you would have to show that the individual was better qualified in order to establish that there was something amiss in the decision-making process. But even if you had some quibble with that instruction, it's clear that the jury didn't even get to that point because it determined through the special interrogatories that there had been no adverse action. And that was an appropriate instruction because you have to have something meaningful happen in order to take advantage of the civil rights laws. The courts are clear that not everything that makes you unhappy in the workplace is actionable under the Human Rights Act. So given the fact that the jury didn't even get to that matter, it wouldn't be something that came into play here, didn't prejudice him, and wouldn't in any event is correct at all. Okay. So are you saying... My understanding from counsel was if you had two candidates who were equally qualified and the employer decided, well, this person's African American and this person's Caucasian, I'm going to take the Caucasian based totally on race, is that a violation of the discrimination laws? If there were proof that that's what happened, but when you're looking and when you're dealing with circumstantial evidence and there was absolutely no evidence submitted in this case that anybody considered gender or that anybody considered race in the decision-making process, if you're trying to go about this through some form of circumstantial evidence, you would have to show that the individual who didn't get the job was so better qualified for that job than the individual who got picked that there's no way that the employer could have done that but for discrimination. Here, that's not even a close call because Ms. Zivitz had the express type of characteristics and qualifications that Mr. Kolkhorst had been looking for and it was uniformly agreed that she had better qualifications and that Mr. Pickett, like 47 other people in the human resource group, did not have those characteristics. This was somebody who has long tenured experience with the company but on the operational side of the business, not working in the corporate setting, not working in compensation and benefits, not working in succession planning and development of senior leaders. With regard to the issue that was brought up on the employment action and whether the relocation package is part of that, there was nothing that stopped counsel at trial from asking questions concerning the relocation package. Mr. Pickett wasn't permitted to testify about it because he didn't have any personal knowledge of what the relocation package was in 2010. He had some modest knowledge of what the package was in 2001. There were no follow-up questions asked about that. And the global head of compensation and benefits was on the stand, called by the plaintiff, and no questions were asked of him concerning that topic. He certainly could have been asked any questions he wanted about that. In this circumstance, the final issue raised by counsel was the matter with regard to Mr. Richard's compensation. There's no evidence of what Mr. Richard's compensation was, despite counsel's statement. But the mere fact that he was not a candidate, merely identified as somebody who was qualified to be considered, but he took himself out of the running, didn't wish to be considered, and wasn't hired for the position, made whatever his salary might have been at the time completely irrelevant. The only two relevant people in this case were Lori Zivitz and Mr. Pickett, and their compensation was appropriately entered into the situation. And counsel argued about the adverse employment instruction number five, that at the time of the conference, as opposed to what's been said here, that it wasn't to make or break instruction. And it wasn't the end of the world. We can still argue and we'll still prove it anyway. The jury disagreed. We respectfully request this court to affirm the underlying decision. Thank you very much. Thank you, Mr. Wolf. Mr. Williamson, do you have a rebuttal? Yes. And to begin the rebuttal, I'd like to accurately state defendant's instruction number five, which the court was kind enough to point out to me, inaccurately stated. The exact sentence is, a lateral or lesser position that would not have resulted in higher pay is not an adverse employment action. Now, my incorrect reference to that sentence does not change the substance of the argument. And that is that this is not an accurate statement of either Illinois law or the facts of the case. The word lesser position is used. The demonstration that would not have resulted in higher pay is used. This promotion to Lori Zywick was a promotion for higher pay. That was the fact. That was the circumstance at trial. Yet ADM was still allowed and is still arguing in this court that given those circumstances, this was not a promotion and therefore was not an adverse job action. Now, we understand that if it's not an adverse job action, the case goes away. You have to have an adverse job action or an adverse action as the plaintiff referenced in his instructions in order to pursue a case for employment discrimination under the Illinois Human Rights Act. So to suggest constantly to the jury that this would not have resulted in higher pay to Mr. Pickett or to Mr. Rickards, although we don't know that because the court wouldn't allow us to put in any evidence as to Mr. Rickards' salary or the reasons he didn't accept the job or wouldn't discuss it further with Mrs. Whitley, that is a contrivance which denied us a fair trial. Now, both special interrogatories and the instructions are considered by this court on a de novo basis, which I understand that you now perform the same analysis that the trial court could have and should have performed at the time of trial. That is the circumstance. I want to additionally point out to you the idea that Illinois is going to follow federal law in every instance is simply not the case. In the Supreme Court's decision, I'm looking at pages 17 and 18 of the appellant's brief, the Sangamon County Sheriff's Department case, the Illinois Supreme Court said at page 138 of 233 Illinois 2nd, although in other instances, Illinois courts have found it appropriate to examine federal decisions when construing the act, and there is a string of citations, we find federal case law to be unhelpful in interpreting 2-102D of the Illinois Human Rights Act. So there have been situations where the Illinois Supreme Court does not follow federal law. And I think that the inquiry about the better qualified reference is the most poignant reference in this case today. When the plaintiff was required to show that he was better qualified than Lori Zywick, he was put at a standard that doesn't exist in Illinois and allowed the jury to return a verdict in favor of ADM and they wouldn't have done that. Thank you. Thank you, counsel. We'll take this matter under advisement and have it be in recess until the same thing.